COURT OF APPEALS OF VIRGINIA

Present:   Judges Athey, Ortiz and Chaney
Argued at Norfolk, Virginia


DANIEL LARRY SCRIVANICH

                                                          MEMORANDUM OPINION* BY
v.        Record No. 1367-23-1                    JUDGE VERNIDA R. CHANEY
                                                             APRIL 8, 2025

LISA COOPER SCRIVANICH


              FROM THE CIRCUIT COURT OF ISLE OF WIGHT COUNTY
                             Lawson W. Farmer, Judge

              Hope C. Hutchinson (Hutchinson Law Center, on briefs), for
              appellant.

              Archer L. Jones, II (Ashby L. Pope, Guardian ad litem for the minor
              children; Jones & Gilchrist, PC; Riddick & Pope, on brief), for
              appellee.


        Daniel Larry Scrivanich (husband) appeals the circuit court's final decree of divorce from

Lisa Cooper Scrivanich (wife).  Husband argues that the circuit court erred by denying his motion to

amend joint legal and physical custody of the parties' minor children on the ground that there was

no material change in circumstances.  He contends that the court erroneously relied only on proffers

of the evidence in rendering judgment.  Husband also says that the circuit court erred in denying his

motion to terminate spousal support, arguing that the court applied an erroneous legal standard

when considering whether the wife had cohabited in a relationship analogous to marriage for one

year or more.  He also challenges the court's finding that the evidence was insufficient to prove

cohabitation.  Finding no error, this Court affirms the circuit court's judgment.

---

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

"When reviewing a [circuit] court's decision on appeal, we view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences." *Nielsen v. Nielsen*, 73 Va. App. 370, 377 (2021) (quoting *Congdon v. Congdon*, 40 Va. App. 255, 258 (2003)).

Husband and wife married in 2001 and had three children together.[2]  In 2017, husband and wife separated and executed a memorandum of agreement.  In paragraph one, the agreement provided the parties joint physical and legal custody of their children and required them to follow a detailed "parenting plan."  In paragraph five, husband agreed to pay wife $2,400 each month in combined child and spousal support.  At first, $1,200 of the payment would constitute spousal support; as each child became an adult and husband's child support obligations decreased, the spousal support increased so that husband would continue to pay wife $2,400 monthly.  The agreement obligated husband to make support payments until wife either remarried or "cohabit[ed] with another in a relationship akin to marriage for a period of more than one year."  The circuit court later entered orders confirming husband's obligation to pay the agreed upon amount of support.

In 2018, husband filed for divorce in the circuit court.  At the same time, he and wife were litigating custody and visitation issues concerning their children in the Isle of Wight County Juvenile and Domestic Relations District Court (the JDR court).  Later that year, husband and wife signed an addendum to the memorandum of agreement.  The addendum provided that any final

---

[1] The record in this case was partially sealed.  "[T]his appeal requires unsealing certain portions to resolve the issues raised by the parties." *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 n.1 (2022).  We unseal only the facts mentioned in this opinion. *See id.*

[2] At the time the circuit court entered the final decree of divorce, one of the children was an emancipated adult; the other two children remained minors.

divorce decree would be subject to the terms of the custody and visitation order entered by the JDR court earlier that year. On June 24, 2019, the JDR court entered a final order granting husband and wife joint legal custody and shared physical custody of the minor children.

In 2021, the circuit court entered an order ratifying and incorporating paragraphs two through thirteen of the memorandum of agreement. In April 2022, during a hearing on husband's motion to enter the final divorce decree, the parties disputed whether the terms of custody and visitation would be determined by paragraph one of the memorandum of agreement or by the JDR court order. The circuit court found that the JDR court order controlled the issue of custody and visitation, and because it was a final order, either party seeking a modification would have to prove a material change in circumstances since that order.

Several months later, wife moved to revise the terms of visitation for the minor children. Husband then moved to terminate his spousal support obligation because wife had been "cohabiting in a relationship analogous to marriage for over one year." Husband also moved to amend custody of the minor children by awarding husband sole legal and primary physical custody.

The circuit court appointed a guardian ad litem (GAL) for the minor children. The GAL filed a report of her investigation in circuit court less than a week before the hearing on the custody and visitation matters. She reported that the children had "a healthy attachment to both parents" and "like the schedule the way it is." Wife was diagnosed with bipolar disorder, and husband had been "really stuck on this issue" with respect to wife's custody and visitation of the children. Despite husband's concerns, the GAL found that wife had been "very compliant with her meds and her therapy" and was "managing her mental health well by all accounts" based on wife's medical records and reports from her psychiatrist and counselor. The GAL added that husband was still employed as a merchant seaman, which required him to travel for several months at a time, but he "mentioned quitting his job and finding a local position." Based on her investigations, the GAL

"did not find much evidence that a material change of circumstances ha[d] occurred" but maintained the possibility that if husband "actually intends to quit his job (or has quit his job) . . . this could constitute a material change of circumstances."

On March 1, 2023, the parties appeared before the circuit court for a hearing on the final decree of divorce, both parties' motions for modification of custody and visitation, and husband's motion to terminate spousal support. After granting husband a divorce, the circuit court addressed the issue of custody and visitation. The court requested that the parties "proffer" the evidence and argument they would present in their "best case scenario," if "all of the evidence goes [their] way," to prove a material change in circumstances warranting a modification of the final JDR court order "before [the court] take[s] evidence on the issue."

Husband proffered that wife "unilaterally" vaccinated the children against COVID-19 despite the parents' agreement not to have them vaccinated. He also proffered that wife "continued to threaten his life." Husband would have introduced into evidence a text message from wife in September 2020 "advis[ing] him she's being hospitalized for a certain time period" due to a "prescription change" and established "ongoing evidence of her continued struggles with her mental illness." Finally, husband proffered that he accepted a new job the week before the hearing and he would no longer be required to travel "away from the home for several weeks at a time."

Wife, meanwhile, proffered evidence that supported her argument for a change in circumstances that favored her. She offered that under the joint physical and legal custody arrangement ordered by the JDR court—with the children's overnight stays with wife in Norfolk expanded by agreement—the children were "flourishing" in Norfolk Public Schools. She explained that their youngest child was put on an IEP "but his mother's worked hard with the school system to help him overcome those reading difficulties." She proffered that the parties

expanded the children's overnight visits in Norfolk to facilitate their continued educational improvement. Wife concluded that if the circuit court did not find a material change in circumstances, "we have reason to believe [husband] will immediately assert his right to have the order go back to where it was," emphasizing that husband "does not cooperate with [wife] to assist the children."

After hearing proffers from both parties on the custody and visitation matters, the circuit court held that there had been no material change in circumstances that would warrant the court modifying the JDR court order. The court stated that its finding was "[b]ased on the proffered evidence," and that "[e]ven if the parties had testified exactly as their counsel had suggested -- because [the court] accepted that proffer as what the testimony would be," the court would reach the same outcome. Noting that husband first indicated his change of employment "literally[] days before a custody hearing," the court explained that the JDR court order "anticipated . . . a change in work schedule" because it provided that "the parties are ordered to be flexible to amend visitation as necessary based on work schedules." The court found that wife's threats did not constitute a change in circumstance because "[t]here is nothing about an order that is going to change" the fact that "the parties aren't getting along." Finally, the court observed that the GAL report "indicates the children are doing well."

After denying the parties' motions to modify custody and visitation, the court excused the GAL from the proceedings. The court asked whether either party had any witnesses "necessary for the custody part" of the proceedings present; both parties responded that they did not. After a brief recess, husband objected to the court's ruling "based on the fact that [the court] ha[d] not seen the evidence presented."

Next, the circuit court heard evidence on husband's motion to terminate spousal support. In 2020, husband had hired a private investigator, Ned Massey, to surveille wife at her residence. In

May, Massey observed a man, Alex Hudson, at wife's residence. Massey periodically observed wife's residence during a two-year period from 2020 to 2022. Over the course of the investigation, he observed Hudson spending the night with wife on 36 occasions. The parties stipulated that Massey had surveilled wife's residence 64 times in total and had found no evidence of Hudson's presence on 27 of those occasions.

Massey conducted surveillance of wife's residence on randomly selected days. Out of the 27 occasions that Massey did not observe Hudson at wife's residence, wife was present "several times." Massey also attempted to conduct surveillance of Hudson at his parents' property. After "roll[ing] by" the property four times and conducting surveillance twice, Massey observed Hudson's car at his mother's property once. Massey reported observing Hudson with the children and wife engaging in activities such as "walking the dog" and traveling in a vehicle together. On some occasions, Massey observed Hudson with wife's father and with the children when wife was not present. While surveilling Hudson at wife's residence, Massey observed Hudson carrying a bag "[a] couple of times," in addition to leaving the residence wearing a different shirt than he wore when he entered.

Both Hudson and wife testified that they had been in a romantic relationship since August 2019, and Hudson first spent the night at wife's residence in the spring of 2020. Hudson and wife denied living together and testified that Hudson resided with his parents. Hudson did not contribute to wife's household bills or expenses, pay rent on wife's residence, have any joint accounts with wife, contribute to wife's attorney fees, or jointly own any property with wife. The couple had not "given rings to each other" or had "any ceremony that suggests a long-term relationship." Hudson had a son from a previous marriage, and wife did not want "to combine households" or have them "all living under the same roof." Rather, Hudson spent time with his son at his parents' address.

According to Hudson and wife, Hudson did not keep any clothing, toiletries, or "personal effects" at wife's residence. Hudson received all his mail at his parents' address, and wife presented evidence of Hudson's tax documents, checks, and Department of Motor Vehicle registration, all listing the residence of Hudson's parents as his address. Wife had lived in two different apartments during her relationship with Hudson; wife's father, James Cooper, was on the lease for both apartments and entered "frequently" to visit his grandchildren, transport them home from school, and make minor repairs. Although he had seen Hudson at wife's apartment, Cooper testified that he did not observe any of Hudson's clothing, toiletries, or other "belongings" except for Hudson's laptop and a "gym bag he would bring over there occasionally."

During her relationship with Hudson, wife explained, Hudson had taken the children to school "twice when [wife] had to work" and had picked the children up from school "once or twice" in "an emergency situation." Hudson confirmed that he had taken the children to school in the past but had not attended any of their school meetings. Cooper testified that Hudson had helped the children with homework and attended "sporting events" with wife and the children. Cooper considered Hudson to have an "emotional commitment" to wife and the children.

Wife, Hudson, and Cooper all testified to how many nights per week Hudson stayed at wife's residence. According to wife, Hudson spent the night "sometimes two, rarely more than three" nights per week. Hudson stated he spent the night "probably . . . about two or three times a week." Cooper believed "three times a week" to be the "maximum."

When husband attempted to serve Hudson with a subpoena at his parents' address, Hudson's mother answered the door and told the process server, Crystal Kleiber, that Hudson "didn't live there." Kleiber "explained to [Hudson's mother] that [she] had another address" and stated wife's address. Hudson's mother replied, "[y]es, that's a good address for him." Hudson's mother testified that she had "mistake[nly]" stated that Hudson did not live there, because she was

"taken aback" and "wasn't aware of who [Kleiber] was" or "why she was there asking me questions about my son."

After hearing the evidence and argument, the circuit court found that husband did not prove by a preponderance of the evidence that wife cohabited with Hudson in a relationship analogous to marriage. Applying the factors established by this Court in *Pellegrin v. Pellegrin*, 31 Va. App. 753, 764-65 (2000), the circuit court found that Hudson and wife were "in a romantic, sexual relationship" but that there was "zero evidence that they share any bills" or "any kind of expenses."[3] More importantly, the circuit court held, husband had not proven the factor of cohabitation, "which is . . . a requirement." Relying on Massey's reports and testimony, the circuit court opined that "over a 950-day period," the private investigator had observed Hudson at wife's residence only "4 percent of the time." Between March and December 2022, Massey had only observed Hudson "10.6 percent of the time" he surveilled wife's residence. The circuit court added that 25% of the time Hudson "was at his parents' house when the private investigator rode by" and that there was "zero evidence that [Hudson] keeps any clothes" at wife's residence.

In addition, the circuit court was unconvinced by husband's evidence that Hudson's mother directed the process server to wife's residence to serve Hudson; Kleiber had suggested wife's address first, and Hudson's mother had merely confirmed it was a "good address" to find Hudson. The circuit court found that husband had established, at most, that Hudson spent the night at wife's residence "two or three nights a week" but that any more than that was merely "suspicion." Therefore, the circuit court denied husband's motion to terminate spousal support. After the hearing, the circuit court entered a final decree of divorce memorializing its rulings. Husband appeals.

---

[3] At this point in the transcript, the circuit court referred to the "*Cranwell*" factors. This is a more recent case that itself used the *Pellegrin* factors. *See Cranwell v. Cranwell*, 59 Va. App. 155, 162 (2011) (quoting *Pellegrin*, 31 Va. App. at 764-66).

ANALYSIS

## I. Custody and Visitation

In his first and second assignments of error, husband argues that the circuit court erred in denying his motion to amend custody and visitation without giving him the opportunity to present evidence. He contends that the circuit court abused its discretion by excluding all evidence without basing its decision on either party's objection or making any rulings as to admissibility of the evidence. He further asserts that the circuit court could not determine whether there had been a material change in circumstances without hearing the actual "evidence and testimony." Moreover, he maintains that "if [his evidence] had been permitted, it would have [demonstrated] a material change in circumstances."[4]

### A. *Preservation of Husband's Arguments for Appeal*

Wife argues that husband failed to preserve these arguments for appeal under Rule 5A:18. "No ruling of the [circuit] court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." Rule 5A:18. "Rule 5A:18 requires a litigant to make timely and specific objections, so that the [circuit] court has 'an opportunity to rule intelligently on the issues presented, thus avoiding unnecessary appeals and reversals.'" *Brown v. Commonwealth*, 279 Va. 210, 217 (2010) (quoting *West v. Commonwealth*, 43 Va. App. 327, 337 (2004)). "Specificity and timeliness undergird the

---

[4] Husband does not challenge the merits of the circuit court's ruling on the evidence as proffered. Rather, he contends only that the circuit court could not adjudicate the issue based solely on proffers, and that if admitted, his evidence *would have* demonstrated a material change of circumstances. Moreover, his prayer for relief asks that this Court remand the matter to the circuit court to admit the evidence before ruling on the existence of a change in circumstances. Thus, we do not evaluate the merits of the circuit court's judgment on the proffered evidence, as that issue is neither before us in husband's argument nor encompassed by his assignments of error. *See Banks v. Commonwealth*, 67 Va. App. 273, 289 (2017) (holding that this Court is "limited to reviewing the assignments of error presented by the litigant").

contemporaneous-objection rule, animate its highly practical purpose, and allow the rule to resonate with simplicity." *Hogle v. Commonwealth*, 75 Va. App. 743, 755 (2022) (quoting *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019)). "If a party fails to timely and specifically object, he waives his argument on appeal." *Id.*

For an objection to be timely, it "must be made . . . at a point in the proceeding when the [circuit] court is in a position, not only to consider the asserted error, but also to rectify the effect of the asserted error." *Scialdone v. Commonwealth*, 279 Va. 422, 437 (2010) (first alteration in original) (quoting *Johnson v. Raviotta*, 264 Va. 27, 33 (2002)); *see also* Code § 8.01-384(A) (providing that an objection is preserved if the objecting party, "*at the time the ruling or order of the court is made or sought*, makes known to the court the action which he desires the court to take or his objections to the action of the court and his grounds therefor." (emphasis added)). The objecting party "need not cite specific legal authority to the [circuit] court," but "must present the objection itself with sufficient particularity to permit the judge, if he or she agrees, to take necessary action." *Jones v. Commonwealth*, 71 Va. App. 597, 607 (2020).

Wife contends that husband's objection, which occurred after the court had excused the GAL from the proceedings and taken a brief recess, was untimely. She further asserts that the statement by husband's counsel that "we are objecting to your ruling based on the fact that you have not seen the evidence presented" lacked sufficient specificity to inform the court "what was complained of and . . . the remedial action desired."

"[T]he . . . presence of a guardian *ad litem* representing the interests of a child who is the subject of a custody and visitation dispute, while permissible, is not required before the court can fully adjudicate the issues presented." *Yopp v. Hodges*, 43 Va. App. 427, 435 (2004). Thus, despite the GAL's absence when husband objected, the circuit court was still able to "rectify the effect of the asserted error" and allow the parties to present evidence and argument. The record

also demonstrates that neither party had additional witnesses who had been dismissed during the recess, so the absence of witnesses did not prevent the court from considering the issue. Finally, husband's objection that "[w]e are objecting to your ruling based on the fact that you have not seen the evidence presented" was sufficiently specific to notify the court that he objected to the ruling on the grounds that he was denied the opportunity to present evidence and that he desired the circuit court to hear the evidence. Therefore, Rule 5A:18 does not bar this Court from considering husband's arguments.

### B. *Lack of Opportunity to Present Evidence*

Husband argues that the circuit court cannot make a finding that there is no material change in circumstances as to custody and visitation after limiting the parties to only a brief proffer of the evidence, and if the evidence and testimony were permitted to be introduced, it would have "resulted in a material change in circumstances."[5]

Assuming without deciding that the circuit court proceeding on the parties' proffers alone was error, it was harmless error. "When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . for *any* error committed on the trial." Code § 8.01-678(2) (emphasis added). Evidentiary errors are harmless when they have no "effect on the outcome of the case." *Isaac v. Commonwealth*, 58 Va. App. 255, 263 (2011). The record here reflects that, before the circuit court reached its decision, both parties had the opportunity to proffer the evidence and testimony they intended to introduce to show a material

---

[5] Parties use proffers to help the circuit court assess the admissibility of evidence or preserve arguments for appellate review. *See, e.g.*, *Warren v. Commonwealth*, 76 Va. App. 788, 799 (2023) ("The circuit court recited the elements of the necessity defense and found, 'I don't think the proffered facts meet the threshold [for admissibility].'"); *Murray v. Commonwealth*, 71 Va. App. 449, 458 (2020) ("Error may not be predicated upon admission or exclusion of evidence, unless . . . the substance of the evidence was made known to the court by proffer." (quoting Va. R. Evid. 2:103)).

change in circumstances. The circuit court "accepted th[e] proffer[s] as what the testimony would be" and based its decision on the proffered evidence. Importantly, both husband and wife agreed that the proffered evidence was "as good as it gets" (as husband agreed, his "best case scenario") if "all of the evidence [went their] way."

Husband proffered that wife "unilaterally" vaccinated the children against COVID-19 despite the parents' agreement not to have them vaccinated. He also proffered that wife "continued to threaten his life." Husband would have introduced into evidence a text message from wife in September 2020 "advis[ing] him she's being hospitalized for a certain time period" due to a "prescription change" and established "ongoing evidence of her continued struggles with her mental illness." Finally, husband proffered that he accepted a new job the week before the hearing and he would no longer be required to travel "away from the home for several weeks at a time."

Wife, meanwhile, proffered evidence that supported her argument for a change in circumstances that favored her. She offered that under the joint physical and legal custody arrangement ordered by the JDR court—with the children's overnight stays with wife in Norfolk expanded by agreement—the children were "flourishing" in Norfolk Public Schools. She explained that their youngest child was put on an IEP "but his mother's worked hard with the school system to help him overcome those reading difficulties." She proffered that the parties expanded the children's overnight visits in Norfolk to facilitate their continued educational improvement. Wife concluded that if the circuit court did not find a material change in circumstances, "we have reason to believe [husband] will immediately assert his right to have the order go back to where it was," emphasizing that husband "does not cooperate with [wife] to assist the children."

- 12 -

The circuit court accepted these proffers as the parties' "best case scenario" if "all of the evidence [went their] way." The circuit court found that there had "been no change in circumstance, not a material change in circumstance that would cause the Court to modify an order that the parties have been living under since 2019." The circuit court reasoned that husband's odd work schedule "has been contemplated" and that "the parties aren't getting along" and "[t]here is nothing about an order that is going to change that." The circuit court also reasoned that finding an agreed change in visitation to be a material change would lead to "a chilling effect [where] [n]o one ever agrees to anything." While husband does not argue that the proffers *themselves* failed to support the circuit court's finding, we note that the "[circuit] court's determination with regard to [custody and] visitation is reversible only upon a showing that the court abused its discretion." *Wynnycky v. Kozel*, 71 Va. App. 177, 193 (2019) (second alteration in original) (quoting *Bedell v. Price*, 70 Va. App. 497, 504 (2019)). Husband has not shown an abuse of discretion on this record, as he points to no factor that the circuit court failed to consider but "should have been given significant weight" in making its custody award. *Powell v. Knoepfler-Powell*, 303 Va. 236, 249 (2024) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 263 (2013)).

As the circuit court accepted the parties' proffers that were their "best case scenario" if "all of the evidence [went their] way " and found no material change in circumstances, the record failed to "show plainly" that the excluded evidence "could not have affected" the outcome. *Contra Barkley v. Wallace*, 267 Va. 369, 374 (2004) (finding error in excluding medical bills as cumulative because their exclusion may "have affected the verdict"). Thus, any error in the court ruling there was no material change in the circumstances based on husband's proffer that represented all of his evidence without hearing the actual evidence and testimony was harmless.

II. Spousal Support

In his third and fourth assignments of error, husband challenges the circuit court's denial of his motion to terminate his spousal support obligations. Husband argues that the circuit court incorrectly applied the law this Court set forth in *Pellegrin* for determining cohabitation analogous to marriage. He contends that the circuit court required him "to prove each of the four factors of cohabitation . . . when only the first factor is a requirement, and the remaining factors are not determinative."

"We begin our analysis by recognizing the well-established principle that all [circuit] court rulings come to an appellate court with a presumption of correctness." *Wynnycky*, 71 Va. App. at 192-93 (quoting *Stiles v. Stiles*, 48 Va. App. 449, 453 (2006)). This "Court reviews de novo all issues of law." *Payne v. Payne*, 77 Va. App. 570, 584 (2023).

In *Pellegrin*, this Court identified four factors "relevant to the court's determination of whether cohabitation has been proved": common residence, intimate or romantic involvement, provision of financial support, and "[d]uration and continuity of the relationship and other indicia of permanency." 31 Va. App. at 764-65. "[I]t is within the province of the [circuit] court to determine what weight to accord each of the factors." *Id.* at 766. The factor of common residence, however, is "a threshold requirement, which is a *necessary* though perhaps not a *sufficient* condition for cohabitation." *Cranwell v. Cranwell*, 59 Va. App. 155, 163 (2011) (emphases added). "[A] court seeking to determine whether a couple is cohabiting in a situation analogous to marriage" must first determine "whether the couple has 'established and shared a common residence.'" *Id.* (quoting *Pellegrin*, 31 Va. App. at 764). If this initial factor is not proven, the couple "by definition" is "not cohabiting." *Id.*

The record reflects that the circuit court correctly applied the law in determining that husband did not prove wife and Hudson were cohabiting in a relationship analogous to marriage.

Although the circuit court noted the presence or absence of other factors—such as Hudson and wife's intimate and romantic involvement and the fact that Hudson did not support wife financially—the circuit court emphasized that husband had not proven the "necessary" "requirement" that Hudson and wife cohabited. The circuit court based its reasoning primarily on evidence relating to how often Hudson was at wife's residence, such as the observations of the private investigator and the testimony relating to how many nights per week Hudson spent there. Contrary to husband's argument, the circuit court did not require husband to prove all four factors. Rather, it found that husband had not proven the "threshold requirement" of common residence.

Husband also argues that the circuit court erred in not finding the evidence sufficient to terminate his spousal support obligations because wife in fact shared a common residence with Hudson, and the remaining factors otherwise demonstrated that they cohabited in a relationship analogous to marriage. He cites cases in which this Court found couples had established a common residence despite not living together full time. *See Stroud v. Stroud*, 49 Va. App. 359 (2007); *Penrod v. Penrod*, 29 Va. App. 96 (1999).

In *Stroud*, this Court found a wife was cohabiting in a relationship analogous to marriage with a woman despite both parties owning two separate homes. 49 Va. App. at 369. The couple spent "an average" of five nights per week together at wife's home "at a minimum," and the woman kept clothing, toiletries, and personal records at wife's house. *Id.* at 373. In addition, private investigators had observed the woman spending "34 consecutive days, with the exception of [a] four-day business trip, in wife's home." *Id.* at 371, 373. In *Penrod*, we held that a couple was cohabiting in a relationship analogous to marriage when the woman "kept numerous items . . . including clothing" in a man's home and admitted to "consciously caus[ing] breaks in the time" she stayed in the man's home to circumvent a provision in her property settlement agreement with her

husband that would end her spousal support if she cohabited with a man for over 60 straight days. 29 Va. App. at 98-99, 101.

This Court's decisions in *Penrod* and *Stroud*, as well as our deferential standard of review, lead us to conclude that the record supports the circuit court's finding that husband had failed to prove that wife and Hudson lived in a common residence. "Employing the most deferential standard of appellate review, we reverse factual findings 'only if plainly wrong or not supported by credible evidence.'" *Nielsen*, 73 Va. App. at 383 (quoting *Broadhead v. Broadhead*, 51 Va. App. 170, 181 (2008)).

Wife, wife's father, and Hudson all testified that Hudson spent two or three nights a week at wife's residence. During a two-year period of surveillance of wife's residence, the private investigator only observed Hudson spending the night 36 times. He did not observe Hudson on 27 of the days he surveilled wife's home. There was no evidence that Hudson kept any clothing or belongings other than his laptop and sometimes a bag at wife's residence. Wife presented evidence that Hudson received his mail at his parents' residence. Unlike in *Stroud*, Hudson does not appear to spend more time in wife's home than his own, and unlike in *Penrod*, there is no evidence that Hudson is intentionally limiting his time at wife's house to avoid a change in wife's spousal support.

In addition, the record supports the circuit court's finding that the evidence as to the other cohabitation factors does not show cohabitation in a relationship analogous to marriage. Although wife and Hudson admitted to being in a romantic relationship since 2019, there was no evidence that Hudson and wife supported each other financially. Further, Hudson and wife had not exchanged rings or had "any ceremony that suggests a long-term relationship," and wife expressed that she did not want to "combine households" with Hudson's son from a previous marriage. This Court, therefore, finds that the record supports the circuit court's conclusion that the evidence was

insufficient to support a finding that wife has cohabited in a relationship analogous to marriage for one year.

## CONCLUSION

The circuit court committed harmless error when it ruled on custody and visitation only on proffer as the record plainly shows that the excluded evidence could not have affected the outcome. Additionally, the record supports the circuit court's finding that husband failed to establish wife had cohabited in a relationship analogous to marriage for one year. Accordingly, this Court affirms the circuit court's judgment.

*Affirmed.*